**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MACK INDUSTRIES, LTD., *et al.*, | ) | Case No. 17-09308 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | Hon. Carol A. Doyle |
| RONALD R. PETERSON, as chapter 7 | ) | |
| Trustee for MACK INDUSTRIES, LTD., | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. _____ |
| | ) | |
| JAMES K. MCCLELLAND and ANN | ) | |
| MCCLELLAND, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Ronald R. Peterson, not individually, but as the chapter 7 trustee (the "Trustee") for the

bankruptcy estates of Mack Industries, Ltd., Mack Industries II, LLC, Mack Industries III, LLC,

Mack Industries IV, LLC, Mack Industries V, LLC, Mack Industries VI, LLC, and Oak Park

Avenue Realty, Ltd. (collectively, the "Debtors") brings this Complaint against James H.

McClelland and Ann McClelland (collectively, the "Defendants") and states as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding brought by the Trustee to: (i) avoid actual and

constructive prepetition fraudulent transfers of purported wages and various other benefits made

by Mack Ltd. and the debtor Oak Park Avenue Realty, Ltd. ("Oak Park"), an entity affiliated with

Mack Ltd., to or for the benefit of James or Ann; (ii) recover preferential transfers from the Debtors

to or for the benefit of Ann;  (iii) recover damages or other equitable relief for Senior's breach of

his fiduciary duties to the Debtors and the Debtors' creditors; and (iv) recover upon an accounting any other property of the Debtors' estates wrongfully obtained or received by the Defendants.

2.     The Trustee also seeks the disallowance of any claims by the Defendants and injunctive relief to preserve and protect the transfers and their fruits *pendente lite*.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and arises in and is related to a case under the Bankruptcy Code, *In re Mack Industries, Ltd., et al.*, pending before the Court as case number 17-09308.

4.     This Court has personal jurisdiction over the Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.  This adversary proceeding has been commenced in this district where the Debtors' bankruptcy cases are pending.

6.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) in which the Court may constitutionally enter final orders.  To the extent this adversary proceeding is deemed a proceeding in which the Court may not constitutionally enter final orders absent the consent of the litigants, the Trustee consents to the entry of final orders by the Court in this adversary proceeding.

## THE PARTIES AND RELATED EVENTS

7.     On March 24, 2017 (the "Petition Date"), Mack Ltd. filed a case under chapter 11 of the Bankruptcy Code (the "Mack Ltd. Case").  On June 1, 2017, the Court entered an order converting the Mack Ltd. Case to a case under chapter 7.  (Case No. 17-09308, Dkt. 92.)  The Court has ordered the joint administration of the Mack Ltd. Case with cases filed under chapter 7

by the five entities affiliated with Mack Ltd.—Mack Industries II, LLC ("<u>Mack Industries II</u>"),

Mack Industries III, LLC ("<u>Mack Industries III</u>"), Mack Industries IV, LLC ("<u>Mack Industries</u>

<u>IV</u>"), Mack Industries V, LLC ("<u>Mack Industries V</u>"), and Mack Industries VI, LLC ("<u>Mack</u>

<u>Industries VI</u>") and together with Mack Ltd., collectively referred to the "<u>Mack Industries</u>

<u>Debtors</u>"—and Oak Park's chapter 7 case (the "<u>Oak Park Case</u>").  (Case No. 17-09308, Dkt. 110,

132, 369.)  The Oak Park Case was originally filed as an involuntary chapter 11 case by certain

creditors of Oak Park on May 31, 2017.  (Case No. 17-16651, Dkt. 1.)  On July 12, 2017, the Court

entered an order converting the Oak Park Case to a case under chapter 7.  (Case No. 17-16651,

Dkt. 29.)

8.      Ronald R. Peterson is the permanent chapter 7 trustee for the bankruptcy estates of

the Debtors, duly qualified and appointed by the Office of the United States Trustee pursuant to §

701(a)(1) of the United States Bankruptcy Code.  (Case No. 17-09308, Dkt. 84; Case No. 17-

16651, Dkt. 31; Case No. 17-16859, Dkt. 8; Case No. 17-17106, Dkt. 6; Case No. 17-17109,

Dkt. 7.)

9.      The Trustee brings this adversary action on behalf of the bankruptcy estates of the

Debtors.

10.     James K. and Ann are a married couple who reside at 15225 Willow Creek Lane,

Orland Park, Illinois.

11.     At all relevant times, Defendants were "insiders" of the Debtors within the meaning

of § 101(31) of the Bankruptcy Code and 740 ILCS 160/2(g).

## **BACKGROUND**

### A.      **The Debtors' Pre-Petition Operations**

12.     The Debtors had two primary businesses.  *First*, the Mack Industries Debtors and

certain non-debtor affiliates would buy properties (mostly single-family residential homes) and

3

renovate and sell the properties. *Second*, Oak Park served as the leasing and brokerage arm of the Debtors and would manage rental properties. In some cases, the Debtors owned the properties that Oak Park managed. In other cases, Oak Park served as the rental management agent of properties owned by other investors.

13.     James K. McClelland ("Senior") and his sons, James H. McClelland ("Junior") and Keith McClelland ("Keith") (collectively, the "McClelland Family") controlled the Debtors. Senior and Junior held all or substantially all ownership interests in the Debtors and non-debtor affiliates, and Senior, Junior, and Keith jointly held and exercised ultimate managerial authority over the Debtors and directed the Debtors' day-to-day operations. Senior is the founder and Chief Executive Officer of Mack Ltd.

14.     Accordingly, Senior, Junior and Keith are all insiders of the Debtors pursuant to § 101(31) of the Bankruptcy Code and 740 ILCS 160/2(g). As Senior, Junior, and Keith had managerial and operational authority over and actually managed the affairs and directed the day-to-day operations of Debtors, all three are persons in control or managing agents of the Debtors and therefore are insiders pursuant to § 101(31)(B)(iii) and (F) of the Bankruptcy Code and 740 ILCS 160/2(g)(2)(C) and (5). Ann is a relative of Senior, Junior, and Keith pursuant to § 101(45) of the Bankruptcy Code and 740 ILCS 160/2(k), and therefore an insider of the Debtors pursuant to § 101(31)(B)(vi) of the Bankruptcy Code and 740 ILCS 160/2(g)(2)(F).

15.     Moreover, both Senior and Junior, as owners of the Debtors, are affiliates of the Debtors within the meaning of § 101(2)(A) of the Bankruptcy Code and 740 ILCS 160/2(a), and Ann, as a relative of Senior and Junior pursuant to § 101(45) of the Bankruptcy Code and 740 ILCS 160/2(k), is an insider of affiliates as if those affiliates were the debtors, and so is also an insider pursuant to § 101(31)(E) of the Bankruptcy Code and 740 ILCS 160/2(g)(4).

16.     Until 2010, the Debtors primarily were a "buy and hold" enterprise. The Debtors' business model was to purchase residential real estate and use that real estate as a longer-term investment.

17.     Beginning in 2010, however, the Debtors shifted to a "buy and sell" model whereby the Debtors would buy residential real estate and seek to flip the real estate quickly to investors. The Debtors would then manage the properties on behalf of those investors, for example, by collecting rents from tenants the Debtors placed in the properties.

18.     The Debtors' largest business partner was American Residential Leasing Company ("ARL").  ARL bought hundreds of properties from the Debtors.  Under a master lease agreement with ARL (the "Master Lease"), Mack Ltd. managed approximately 500 single-family residential units owned by ARL.

19.     Under the Master Lease, Mack Ltd. was required to pay to ARL monthly rents, a percentage of the revenue, and all property expenses (including property taxes).

20.     In June 2014, however, the relationship between the Debtors and ARL began to sour when the Debtors informed ARL that Mack Ltd.'s revenue was insufficient to cover its expenses under the Master Lease.  In fact, it appears that operating under the Master Lease had never been profitable for the Debtors.

21.     By September 2014, Mack Ltd. had defaulted on its obligations to ARL under the Master Lease.  Moreover, beginning in 2014, Mack Ltd. stopped paying the property taxes on the ARL properties.

22.     ARL has alleged that Mack Ltd. owes over $1,600,000.00 in property taxes for the 2013 tax year alone, and millions of dollars more for subsequent tax years, as well as unpaid rents and other amounts owing under the Master Lease.  ARL ultimately brought suit against Mack Ltd.

5

in the Chancery Division of the Cook County Circuit Court on March 21, 2016. *See Am. Residential Leasing Co., LLC v. Mack Indus., Ltd.*, 2016-CH-03970.

23.      The issue with ARL was just a harbinger of things to come. By January 2015, the Debtors defaulted on several other obligations and were generally not paying their debts as they became due.

24.      On information and belief, at all relevant times, the sum of each of the Debtors' liabilities exceeded the sum of the then-fair value of each of the Debtors' assets, or the sum of the liabilities of all of the Debtors and their affiliates exceeded the sum of the then-fair value of the assets of all of the Debtors and their affiliates. Likewise, as of the Petition Date, the sum of each of the Debtors' liabilities exceeded the sum of the then-fair value of each of the Debtors' assets, or the sum of the liabilities of all the Debtors and their affiliates exceeded the sum of the then-fair value of the assets of all the Debtors and their affiliates.

25.      On information and belief, by 2014, as a result of the defaults and the general financial decline of the businesses, the Debtors were engaged in ongoing negotiations with one or more of their creditors to avoid collection attempts and potential litigation. For example, in June 2014, Mack Ltd. attempted, but failed, to negotiate more favorable terms with ARL. During those June 2014 negotiations, Eric Workman, the then-Vice President of sales and marketing at Mack Ltd., threatened ARL that unless it modified the terms of its agreement with Mack Ltd., the Debtors would dissipate assets for less than a fair consideration or take other steps to delay, hinder, or defraud ARL of its rights and remedies as a creditor.

26.      Additionally, as part of the Debtors' residential management operations, Oak Park collected rents from the Debtors' tenants and was required to hold the security deposits and other monies that Oak Park received from the tenants and managed in segregated trust accounts.

Millions of dollars of these prepetition rents and profits were already missing at least as early as the Oak Park Petition Date, if not earlier.  Likewise, by the time the Trustee was appointed as the case trustee of Oak Park and had taken control of Oak Park's assets, the security deposits had disappeared from the trust accounts as well.

**B.      The Debtors' Fraudulent Transfers**

27.      During the period when Mack Ltd. was insolvent, Senior, along with other members of the McClelland Family and their relatives, were pursuing a plan to hide their assets and the assets of their business, including both the Debtors and non-debtor affiliates alike, and place those assets out of the reach of their creditors.

28.      This scheme took many forms.  *First*, Ann received large sums of money from Mack Ltd. and Oak Park as purported "wages" despite never being an employee of any of the Debtors or non-debtor affiliates.  Specifically, according to the Debtors' payroll entries in their accounting records (the "Payroll Records") for the years from 2013-2017, Senior received a total of $787,092.00 in payroll compensation from the Debtors.  Ann, who was not an employee or owner of any Debtor, did not provide any services to any Debtor, did not own any equity in any Debtor, and was not owed any money by any Debtor, received $269,885.00 (the "Wages") from the Debtors during the years 2013-2017.  See, Exhibit A.  The only plausible explanation for this discrepancy is that the Debtors, at the McClellands' (and specifically Senior's) direction, paid a portion of Senior's earnings to Ann to hide that income from Senior's creditors.

29.      *Second*, the Debtors also covered the costs of, *inter alia*, Senior and Ann's medical insurance, taxes, automobile purchases and motor fuel (the "Benefits").  The Debtors' books and records reflect that for the years 2013-2017, Senior and Ann received a total of $2,995,664 from the Debtors in Benefits. See, Exhibit B. As for Ann, the Debtors' books and records reflect that for the years 2013-2017, she received a total of $75,710 from the Debtors in Benefits. The Debtors

did not pay Ann's Benefits as part of any agreement with the Defendants or in return for any services rendered.  Instead, the Debtors paid the Benefits not in exchange for any consideration, but simply another way to funnel money to the Defendants without alerting their creditors.

30.     *Third*, the Debtors also made large "equity" distribution to Senior and Ann.  From 2013-2017, the Debtors paid Senior $2,919,955 in equity distributions and paid Ann $75,710 in equity distributions (the "Equity Distributions").  See, Exhibit C.   The Debtors did so despite being, at all relevant times, in deep financial trouble and during a period of time where the Debtors were not paying their obligations as they became due.  Moreover, the Equity Distributions to Ann are particularly problematic as she had no ownership interest in the Debtors for an Equity Distribution to be made on account of.

31.     The transfers of the Wages, Benefits, and Equity Distributions were made to insiders, were done in such a way so as to hide them from third parties and served no legitimate business purpose of the Debtors.

32.     *Fourth,* it appears that Senior and Ann's efforts to hide their income extended to materially understating their income to the IRS.  For example, in their 2015 tax returns, they reported total income in the amount of $254,800.00.  The Debtors Payroll Records, however, show that for 2015, they actually received $518,473.00 in income for 2015 consisting of $254,000.00 in salary and $263,673.00 in other distributions and payments.

## COUNT I

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code**
**(Transfer of Wages, Benefits, and Equity Distributions)**

33.     The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 32.

34.     Within two years prior to the Petition Date, during the period of 2015 to 2017, the

Debtors transferred (i) the Wages with the actual intent to hinder, delay, or defraud the Debtors'

creditors; (ii) the Benefits to or for the benefit of Senior or Ann; and (iii) the Equity Distributions

with the actual intent to hinder, delay, or defraud the Debtors' creditors (the "Actual Fraudulent

Transfer of Wages, Benefits and Equity Distributions") within the meaning of § 548(a)(1)(A) of

the Bankruptcy Code.  These transactions are identified on Exhibits A, B, and C of this Complaint.

35.     The Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions

constituted a transfer of an interest of the Debtors in property.

36.     The Debtors made the Actual Fraudulent Transfer of Wages, Benefits, and Equity

Distributions immediately or mediately, to or for the benefit of Senior or Ann.

37.     Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, the Trustee may avoid the

Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

38.     Pursuant to § 550(a) of the Bankruptcy Code, the Trustee may recover, for the

benefit of the estate, the Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions

or the value thereof from Senior and Ann, as either (1) the initial transferee of the Wages, Benefits,

and Equity Distributions or a person for whose benefit the Actual Fraudulent Transfer of Wages,

Benefits, and Equity Distributions were made or (2) the immediate or mediate transferee of any

initial transferees of the Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

WHEREFORE, the Trustee respectfully requests, pursuant to §§ 548(a)(1)(A) and 550(a)

of the Bankruptcy Code, that the Court:

A.     Enter judgment in favor of the Trustee and against Defendants James K. and Ann

McClelland to avoid the Actual Fraudulent Transfers of Wages, Benefits, and Equity Distributions

and to recover all interests in the Actual Fraudulent Transfers of Wages, Benefits, and Equity

Distributions or the value thereof for the sole benefit of the Debtors' bankruptcy estate;

    B.    Permanently restrain and enjoin Defendants James K. and Ann McClelland from

taking any acts as the recipients or beneficiaries of the Actual Fraudulent Transfers of Wages,

Benefits, and Equity Distributions; and

    C.    Grant such other or further relief as the Court may deem just.

## COUNT II

**Avoidance and Recovery of Constructive Fraudulent Transfers
Pursuant to §§ 548(a)(1)(B) and 550(a) of the Bankruptcy Code
(Transfer of Wages, Benefits, and Equity Distributions)**

39.    The Trustee repeats, realleges, and incorporates, as though fully set forth herein,

paragraphs 1 through 32.

40.    Within two years prior to the Petition Date, during the period of 2015 to 2017, the

Debtors transferred (i) the Wages with the actual intent to hinder, delay, or defraud the Debtors'

creditors; (ii) the Benefits to or for the benefit of Senior or Ann; and (iii) the Equity Distributions

without receiving a reasonably equivalent value in exchange therefor (the "Constructive

Fraudulent Transfer of Wages, Benefits, and Equity Contributions") within the meaning of

§ 548(a)(1)(B) of the Bankruptcy Code.  These transactions are identified on Exhibits A, B, and C

of this Complaint.

41.    The Constructive Fraudulent Transfer of Wages, Benefits, and Equity

Contributions constituted a transfer of an interest of the Debtors in property.

42.    The Debtors made the Constructive Fraudulent Transfer of Wages, Benefits, and

Equity Contributions immediately or mediately, to or for the benefit of Senior or Ann.

43.    At the time of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity

Contributions, the Debtors were in financial distress.  For example, by September 2014, Mack Ltd.

10

had defaulted on obligations to one of the Debtors' largest creditors at the time, ARL, and by January 2015 or shortly thereafter, the Debtors and their affiliates began to experience significant defaults with other creditors as well.  These defaults continued and increased in frequency from the time of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions through the Petition Date.

44.     By the time of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, the Debtors had generally stopped paying their debts as they became due as the Debtors' obligations far outstripped its revenues.

45.     At the time of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions the Debtors were engaged or were about to engage in business or transactions for which the assets remaining with the Debtors after the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions would be or were unreasonably small in relation to the business or transactions in which the Debtors were or were about to be engaged.

46.     At the time of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts became due and in fact were unable to pay their debts as they became due.

47.     The Debtors were insolvent on the date on which they made the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions or became insolvent as a result of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

48.     Pursuant to § 548(a)(1)(B) of the Bankruptcy Code, the Trustee may avoid the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

49.     Pursuant to § 550(a) of the Bankruptcy Code, the Trustee may recover, for the benefit of the estate, the Wages, Benefits, and Equity Distributions from Senior and Ann, as either (1) the initial transferees of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions or the persons for whose benefit the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2) the immediate or mediate transferees of any initial transferee of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

WHEREFORE, the Trustee respectfully requests, pursuant to §§ 548(a)(1)(B) and 550(a) of the Bankruptcy Code, that the Court:

A.      Enter judgment in favor of the Trustee and against Defendants James K. and Ann McClelland to avoid the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions and to recover all interests in the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions for the sole benefit of the Debtors' estate;

B.      Permanently restrain and enjoin Defendants James K. and Ann McClelland from taking any acts as the recipient or beneficiary of the Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions; and

C.      Grant such other or further relief as the Court may deem just.

### COUNT III

**Avoidance and Recovery of Actual Fraudulent Transfers Pursuant to
740 ILCS 160/5(a)(1) and 160/8(a) and §§ 544(b)(1) and 550(a) of the Bankruptcy Code
(Transfer of Wages, Benefits, and Equity Distributions)**

50.     The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 32.

51.     Within four years prior to the Petition Date, during the period of 2013 to 2017, the Debtors transferred (i) the Wages to or for the benefit of Senior and Ann; (ii) the Benefits to or for

12

the benefit of Senior or Ann; and (iii) the Equity Distribution to or for the benefit of Senior or Ann (the "UFTA Actual Fraudulent Transfer of Wages, Benefits and Equity Distributions"). These transactions are identified on Exhibits A, B, and C of this Complaint. The UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made with the actual intent to hinder, delay, or defraud the Debtors' creditors within the meaning of section 5(a)(1) of the Illinois UFTA.

52.    The UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions constituted a transfer of the Debtors' property.

53.    The Debtors made the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions immediately or mediately, to or for the benefit of Senior or Ann, who were insiders of the Debtors pursuant to 740 ILCS 160/2(g).

54.    There was at least one lawsuit pending against the Debtors before or at the time the Debtors made some or all the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

55.    Senior or Ann received the Wages, Benefits, and Equity Distributions or the benefit of the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions without providing any value to the Debtors.

56.    Creditors of the Debtors exist that could avoid the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions and could obtain further relief pursuant to sections 8 and 9 of the UFTA. Specifically, these creditors could avoid the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions pursuant to section 8(a) of the Illinois UFTA, and could obtain a judgment for the Wages, Benefits, and Equity Distributions against Senior and Ann, as either (1) the first transferees of the UFTA Actual Fraudulent Transfer

of Wages, Benefits, and Equity Distributions or persons for whose benefit the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2) subsequent transferees, pursuant to section 9(b) of the Illinois UFTA.  For example, ARL is a creditor of Mack Ltd. that, as of the Petition Date, could have avoided the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions or obtained further or other relief pursuant to section 8(a) of the Illinois UFTA.  Therefore, ARL as of the Petition Date could have obtained a judgment for the Wages, Benefits, and Equity Distributions against Senior or Ann, as either (1) the first transferees of the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions or persons for whose benefit the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2) subsequent transferees, pursuant to section 9(b) of the Illinois UFTA.

57.     Pursuant to § 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

58.     Pursuant to § 550(a) of the Bankruptcy Code, the Trustee may recover, for the benefit of the estate, the Wages, Benefits, and Equity Distributions or the value thereof from Senior and Ann, as either (1) the initial transferees of the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions or persons for whose benefit the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2) the immediate or mediate transferees of any initial transferees of the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

WHEREFORE, the Trustee respectfully requests, pursuant to 740 ILCS 160/5(a)(1) and 160/8(a) and §§ 544(b)(1) and 550(a) of the Bankruptcy Code, that the Court:

A.     Enter judgment in favor of the Trustee and against Defendants James K. and Ann McClelland to avoid the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions and to recover all interests in the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions or the value thereof for the sole benefit of the Debtors' estate;

B.     Permanently restrain and enjoin Defendants James K. and Ann McClelland from taking any acts as the recipient or beneficiary of the UFTA Actual Fraudulent Transfer of Wages, Benefits, and Equity Distributions; and

C.     Grant such other or further relief as the Court may deem just.

## COUNT IV

**Avoidance and Recovery of Constructive Fraudulent Transfers Pursuant to
740 ILCS 160/5(a)(2), 160/6(a) and 160/8(a) and §§ 544(b)(1) and 550(a) of the Bankruptcy Code
(Transfer of Wages, Benefits, and Equity Distributions)**

59.     The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 32.

60.     Within four years prior to the Petition Date, during the period of 2013 to 2017, the Debtors transferred (i) the Wages to or for the benefits of Senior and Ann; (ii) the Benefits to or for the benefits of Senior or Ann; and (iii) the Equity Distributions to or for the benefit of Senior or Ann, without receiving a reasonably equivalent value in exchange therefor (the "UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions") within the meaning of sections 5(a)(2) and (6)(a) of the Illinois UFTA.  These transactions are identified on Exhibits A, B, and C of this Complaint.

61.     The UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions constituted a transfer of the Debtors' property.

62.     The Debtors made the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, immediately or mediately, to or for the benefit of Senior or Ann.

63.     At the time of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, the Debtors were in financial distress.  For example, as is more fully set forth above, by September 2014, Mack Ltd. had defaulted on obligations to one of the Debtors' largest creditors at the time, ARL, and by January 2015 or shortly thereafter, the Debtors and their affiliates began to experience significant defaults with other creditors as well.  These defaults continued and increased in frequency from the time of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions through the Petition Date.

64.     By the time of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, the Debtors generally had stopped paying their debts as they became due as the Debtors' obligations far outstripped their revenues.

65.     At the time of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, the Debtors were engaged or were about to engage in business or transactions for which the assets remaining with the Debtors after the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions would be or were unreasonably small in relation to the business or transactions in which the Debtors were or were about to be engaged.

66.     At the time of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts became due and in fact were unable to pay their debts as they became due.

67.     The Debtors were insolvent on the date on which they made the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions or became insolvent as a result of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

68.     Creditors of the Debtors exist that could avoid the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions and could obtain further relief pursuant to sections 8 and 9 of the Illinois UFTA.   Specifically, these creditors could avoid the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions pursuant to section 8(a) of the Illinois UFTA, and could obtain a judgment for the Wages, Benefits, and Equity Distributions against Senior or Ann, as either (1) the initial transferees of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions or persons for whose benefit the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2) subsequent transferees, pursuant to section 9(b) of the Illinois UFTA.  For example, ARL is a creditor of Mack Ltd. that as of the Petition Date could have avoided the UFTA Constructive Fraudulent Transfer of Wages and Benefits or obtained further or other relief pursuant to section 8(a) of the Illinois UFTA.  Therefore, ARL as of the Petition Date could have obtained a judgment for the Wages, Benefits, and Equity Distributions against Senior and Ann, as either (1) the initial transferees of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions or persons for whose benefit the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2)  subsequent transferees, pursuant to section 9(b) of the Illinois UFTA.

69.     Pursuant to § 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

70.     Pursuant to § 550(a) of the Bankruptcy Code, the Trustee may recover, for the benefit of the estate, the Wages, Benefits, and Equity Distributions or the value thereof from Senior and Ann as either (1) the initial transferees of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions or persons for whose benefit the UFTA Constructive

Fraudulent Transfer of Wages, Benefits, and Equity Distributions were made or (2) the immediate or mediate transferees of any initial transferee of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions.

WHEREFORE, the Trustee respectfully requests, pursuant to 740 ILCS 160/5(a)(2), 160/6(a) and 160/8(a) and §§ 544(b)(1) and 550(a) of the Bankruptcy Code, that the Court:

A.      Enter judgment in favor of the Trustee and against Defendants James K. and Ann McClelland to avoid the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions and to recover all interests in the Wages, Benefits, and Equity Distributions or the value thereof for the sole benefit of the Debtors' estate;

B.      Permanently restrain and enjoin Defendants James K. and Ann McClelland from taking any acts as the recipient or beneficiary of the UFTA Constructive Fraudulent Transfer of Wages, Benefits, and Equity Distributions; and

C.      Grant such other or further relief as the Court may deem just.

## COUNT V

**Avoidance of Preferential Transfers Pursuant to §547 of the Bankruptcy Code**

71.     The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 32.

72.     On or within 90 days immediately prior to the Debtors' petition dates (the "***Preference Period***"), one or more of the Debtors made the Transfers to or for the benefit of Ann in an aggregate amount not less than $25,000. See, Exhibit D.

73.     Each Transfer was made from one or more of the Debtor Accounts and constituted a transfer of an interest in property of one or both of the Debtors.

74.     Ann was a creditor of one or both of the Debtors at the time of each Transfer within the meaning of 11 U.S.C. § 101(10)(a).

75.     Each Transfer was made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts then owed by one or more of the Debtors to Ann.

76.     Each Transfer was made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors to Ann before such Transfer was made.

77.     Each Transfer was made while the Debtors were insolvent.

78.     The Debtors were insolvent at all times during the Preference Period.

79.     The Trustee is entitled to the presumption of insolvency for each Transfer made during the Preference Period pursuant to 11 U.S.C. § 547(f).

80.     As a result of each Transfer, Ann received more than Ann would have received if: (i) the Debtors' cases were under chapter 7 of the Bankruptcy Code; (ii) the Transfer had not been made; and (iii) Ann received payments of its debts under the provisions of the Bankruptcy Code.

81.     As evidenced by the Debtors' schedules filed in the underlying bankruptcy case as well as the proofs of claim that have been received to date, the Debtors' liabilities exceed their assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtors' bankruptcy estates.

82.     In accordance with the foregoing, each Transfer is avoidable as a preferential transfer pursuant to 11 U.S.C. § 547(b).

WHEREFORE, the Trustee respectfully requests pursuant to 11 U.S.C. §§ 547(b) and 550 that the Court:

A.     Enter judgment in favor of the Trustee to avoid the Transfers to Ann McClelland;

B.      Enter judgment in favor of the Trustee and against Ann McClelland in the amount of the Transfers, plus pre- and post-judgment interest, fees and costs to the extent provided by law; and

C.      Grant the Trustee such other and further relief as the Court may deem equitable and just.

**COUNT VI**

**Breach of Fiduciary Duty**

83.     The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 70.

84.     Within five years prior to the Petition Date, during the period of 2012 to 2017, and at all other times relevant to this Complaint, Senior was a director, officer, employee, or other agent of, or another person acting in a fiduciary capacity for, the Debtors.

85.     From the moment Senior agreed or began in fact to act in a fiduciary capacity for the Debtors, Senior undertook a duty to act in good faith and with the utmost fidelity to the interests of the Debtors, and owed the Debtors the duties of good faith, care, and loyalty.

86.     Senior's status as an insider of the Debtors, and in particular the owner and Chief Executive Officer of the Debtors and non-debtor affiliates, imbued Senior with a unique quantity and quality of control over the Debtors and the Debtors' property.

87.     At the time of the acts and omissions set forth below, and within at least four years prior to the Petition Date, during the period from 2013 to 2017, the Debtors were in financial distress, generally had stopped paying their debts as they became due, and the Debtors' obligations far outstripped their revenues.  For example, as is more fully set forth above, by September 2014, Mack Ltd. had defaulted on obligations to one of the Debtors' largest creditors at the time, ARL, and by January 2015 or shortly thereafter, the Debtors and their affiliates began to experience

significant defaults with other creditors as well.  These defaults continued and increased in frequency from the time of the acts and omissions set before below through the Petition Date.

88.    The Debtors were insolvent at the time of the acts or omissions set forth below, and Senior owed the Debtors' creditors the duties of good faith and loyalty.

89.    Senior breached his fiduciary obligations to the Debtors and the Debtors' creditors by engaging in the conduct more fully described above, including, but not limited to, the following acts or omissions:

A.    Senior engaged in extensive self-dealing and misappropriated corporate assets and profits for his own personal gain or the gain of his relatives or other insiders, and to the detriment of the Debtors and the Debtors' creditors, by causing or directing the transfers of the Wages, the Benefits and the Equity Distributions to or for the benefit of the Defendants;

B.    Senior failed to keep and render to the Debtors or the Trustee an account of monies or other properties Senior or his relatives received on behalf or at the expense of the Debtors or the Debtors' creditors;

C.    Senior failed to use reasonable efforts to provide the Debtors or the Trustee with information relevant to affairs of the Debtors entrusted to Senior, despite having actual notice of the need to provide such information and despite owing no superior duty to a third party to withhold such information; and

D.    Senior acted unreasonably and in bad faith and engaged in conduct likely to damage the Debtors' enterprise.

90.    Senior further breach his fiduciary duties to the Debtors as follows:

A.    During the first six months of 2016,  Senior and Junior converted all of the rents paid to Oak Park for their own use and thus, those rents were never paid to Debtors' creditors; and

B.    Pursuant to the Illinois Homestead Exemption statute, a real estate taxpayer may be entitled to a reduction in its property taxes if they own the property as their principal dwelling place.  A renter who is responsible for paying real estate taxes on their rental property as their principal dwelling place may also claim a homeowner's exemption.  A landlord may not claim a homeowner's exemption because by definition, the property is not the landlord's principal dwelling place.  Nevertheless, Senior and Junior filed thousands of phony homestead exemptions with the Cook County Assessor's office by using their tenants' information and forging their signatures to obtain homestead exemptions on their behalf even though they did not pay the real estate taxes on their rental property.  Defendants breached their duty to Debtors by causing Debtors to be liable to the Illinois Assessor for the ill-gotten exemptions, penalties and interest.

91.    Senior's breaches of his fiduciary duties are a proximate cause of injuries to the Debtors and the Debtors' creditors, including, but not limited to, lost profits and diminution of the value of the Debtors' business.

WHEREFORE, the Trustee respectfully requests that the Court:

A.      Enter judgment in favor of the Trustee and against Defendant James K. McClelland for actual and punitive damages in amounts to be determined at trial, plus interests, costs, and attorneys' fees;

B.      Order Defendant James K. McClelland to return to the Trustee as forfeited all compensation paid by the Debtors to Defendant James K. McClelland during the period he breached his fiduciary duties;

C.      Impose a constructive trust or equitable lien on all of Defendant James K. McClelland's interests in the Property, the Benefits, the Prepetition and Postpetition Rents, and any proceeds thereof;

D.      Permanently restrain and enjoin Defendant James K. McClelland from taking any acts with respect to the Benefits and from taking any acts to interfere with the orderly liquidation of the Debtors pursuant to the Bankruptcy Code and all other applicable law; and

E.      Grant such other or further relief as the Court may deem just.

## COUNT VII

### Accounting

92.     The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 91.

93.     Prior to the commencement of this adversary proceeding, the Defendants wrongfully obtained or received monies and other property or benefits from the Debtors, to the detriment and at the expense of the Debtors, the exact amount of which is not currently known to the Trustee.  For example, it appears that Senior misappropriated the Debtors' assets by, for example, having Debtors pay for the Benefits, and Ann received the Wages without having performed any work or given any value to the Debtors whatsoever.

94.    Upon an accounting by the Defendants, there will be found to be due and owing to the Trustee by the Defendants monies and other property or benefits that the Defendants wrongfully took or received from the Debtors, the exact amount of which is not currently known to the Trustee.

95.    In light of the fraudulent nature of the conduct described above, including, but not limited to, the fraudulent transfers, Senior's breaches of his fiduciary duties to the Debtors and the Debtors' creditors, and also the varied sources of monies and other property or benefits for which the Defendants will have to account, the Trustee lacks an adequate remedy at law.

WHEREFORE, the Trustee respectfully requests that the Court order the Defendants to account to the Trustee any monies or other property or benefits that they received from the Debtors in the past four years and grant such other or further relief as the Court may deem just.

## <u>COUNT VIII</u>

**Preliminary Injunction Freezing Assets Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Rule 7065 of the Bankruptcy Rules, and § 105(a) of the Bankruptcy Code**

96.    The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 95.

97.    The Trustee seeks preliminary injunctive relief restraining and prohibiting the Defendants: (A) from transferring, using, dissipating or otherwise disposing of (i) the Wages, the Benefits, and the Equity Distributions (ii) any other transferred or misappropriated assets, ill-gotten gains, or other property, proceeds, or profits sought to be recovered in Counts I through VIII above; and (B) from taking any acts to interfere with the orderly liquidation of the Debtors' estates, including, but not limited to, collecting rents from or otherwise dealing with or contacting the Debtors' tenants.

98.   The preliminary injunction sought by the Trustee against the Defendant is appropriate pursuant to Rule 65 of the Federal Rules of Civil Procedure, made applicable by Rule 7065 of the Bankruptcy Rules, and independently pursuant to § 105(a) of the Bankruptcy Code.

99.   The Trustee lacks adequate legal remedies and will suffer irreparable harm without a preliminary injunction as it is likely that, without provisional equitable relief to maintain the status quo *pendente lite*, the Trustee will ultimately be unable to recover the fraudulently transferred estate property or obtain any of the other relief sought against the Defendants for the benefit of the Debtors' estates.  There is a high risk of dissipation or further transfers of the assets the Trustee seeks to recover in the absence of an injunction preserving the status quo *pendente lite* given the past conduct of the Defendants, as described above, including a pattern of fraudulent transfers to or for the benefit of the Defendants as well as, in the case of Senior, a history of numerous breaches of his fiduciary duties and of flagrant disregard for court orders and other applicable law.  Simply put, the Defendants' past behavior is the strongest indicator that without an injunction, the Defendants will seek to dissipate the property the Trustee now seeks to recover while this adversary proceeding is pending, thereby continuing to inequitably harm the Debtors' estates leaving the Trustee and the Debtors' estates with no adequate relief at law.

100.   The Trustee has a reasonable likelihood of prevailing on the merits of some or all of his claims in this adversary proceeding.  For example, many, if not all, of the transfers the Trustee seeks to avoid were made in exchange for no or practically no consideration at all at a time of severe and increasing financial distress for the Debtors.  Likewise, there are numerous badges of fraud present by the allegations in this Complaint, including, among others, transfers to insiders or the relatives of insiders, concealment of transfers or the recipients thereof, threat of and actual

suits against the Debtors before the time of the transfers, a lack of any fair consideration, the Debtors' insolvency before or shortly after the transfers, and the overall history and pattern of inequitable conduct by the Defendants, especially Defendant James K. McClelland, for their own gain at the expense of the Debtors and the Debtors' creditors.  Under the facts as alleged in this Complaint, therefore, it is reasonably likely that the Trustee will prevail on the merits of some or all of his claims against the Defendants.

101.    Finally, the balance of hardships and the public interest both favor the Trustee over the Defendant.  Without a preliminary injunction, the Trustee may well be unable to recover the transferred interests in the Wages, the Benefits, and the Equity Distributions for the benefit of Debtors' estates.  By contrast, the burden on the Defendants to comply with the requested injunctive relief would entail merely maintaining the pre-suit status quo while this adversary proceeding is pending.  Moreover, the public interest weighs in favor of the Trustee, as a preliminary injunction would further the essential purpose of the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Allowing the Defendants to dissipate estate property or continue to receive or obtain the proceeds or profits of estate property, by contrast, would serve no public interest at all.

WHEREFORE, the Trustee respectfully requests that the Court enter a preliminary injunction restraining and prohibiting the Defendants *pendente lite* from:

A.    Transferring, using, dissipating or otherwise disposing of (i) the Wages, the Benefits, and the Equity Distributions, and (ii) any other transferred or misappropriated assets, ill-gotten gains, or other property, proceeds, or profits sought to be recovered in Counts I through VII above;

26

B.     Taking any acts to interfere with the orderly liquidation of the Debtors' estates, including, but not limited to, collecting rents from or otherwise dealing with or contacting the Debtors' tenants; and

C.     Grant such other or further relief as the Court may deem just.

## COUNT IX

### Disallowance of Claims

102.   The Trustee repeats, realleges, and incorporates, as though fully set forth herein, paragraphs 1 through 101.

103.   Pursuant to § 502(d) of the Bankruptcy Code, the Court shall disallow any claim of any entity from which property is recoverable under §§ 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under §§ 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.

104.   Because the Defendants have not turned over the Fraudulent Transfers to the Trustee, Court must under § 502(d) of the Bankruptcy Code disallow any claims the Defendants may assert against the Debtors until the Defendants turn over the Fraudulent Transfers to the Trustee or pay the Trustee the value of the Fraudulent Transfers.

WHEREFORE, the Trustee respectfully requests, pursuant to 11 U.S.C. § 502(d), that the Court disallow any claims of the Defendants against the Debtors pursuant to § 502(d) of the Bankruptcy Code and grant such further and other relief as the Court may deem just.

Respectfully submitted,

Dated: March 22, 2019

RONALD R. PETERSON, not individually but as the chapter 7 Trustee for the bankruptcy estates of Mack Industries, Ltd., *et al.*,

By:  /s/ Edward T. Joyce

Edward T. Joyce
Rowena T. Parma
Robert D. Carroll
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 South LaSalle Street
Suite 2200
Chicago, IL 60603
TEL:   312-641-2600
FAX:   312-641-0360

*Special Counsel for the Chapter 7 Trustee*

# **EXHIBIT A**

**Ann McClelland**

Wages

January 1, 2013 – June 30, 2017

| 2013 | 2014 | 2015 | 2016 | 2017 | TOTAL |
|------|------|------|------|------|-------|
|      |      |      |      |      |       |
| $66,300 | $10,200 | $83,800 | $83,800 | $25,785 | $269,885 |
|      |      |      |      |      |       |

# EXHIBIT B

**James K. and Ann McClelland**

Benefits

January 1, 2013 – June 30, 2017

| | |
|---|---|
| Personal Home Related Payments | $235,491 |
| Non-Classified Distribution | 789,710 |
| Taxes | 889,823 |
| ARP Transactions | 308,400 |
| Healthcare/Insurance | 122,216 |
| Miscellaneous | 161,112 |
| Sale of Mack Construction | 150,000 |
| Loan Payment | 244,513 |
| Auto/Gas | 67,739 |
| Stock Purchase | 25,000 |
| Casino/Gambling | 1,558 |
| Traffic Violation | 103 |
| TOTAL | $2,995,665.00 |

# <u>EXHIBIT C</u>

**James K. and Ann McClelland**

Equity Distributions

January 1, 2013 – June 30, 2017

| | |
|---|---:|
| James K. McClelland | $2,919,955 |
| Ann McClelland | 75,710 |
| TOTAL | $2,995,665 |

# EXHIBIT D

**Ann McClelland**

Preferential Transfers

| | |
|---|---|
| 12/30/16 | $5,000 |
| 01/31/17 | 5,000 |
| 01/31/17 | 5,000 |
| 01/31/17 | 5,000 |
| 02/28/17 | 5,000 |
| | |
| TOTAL | $25,000 |